Filed 12/15/15  In re E.M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.M. et al., Persons Coming Under the Juvenile Court Law. | B264780 (Los Angeles County Super. Ct. No. DK08870) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. PATRICIA A. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra L. Losnick, Juvenile Court Referee.  Affirmed.

Michelle Ben-Hur, under appointment by the Court of Appeal, for Defendant and Appellant Patricia A.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant Edwin M.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

Mother Patricia A. and father Edwin M. appeal from the court's jurisdictional and dispositional orders sustaining a dependency petition as to their daughters, C.M. and E.M., and removing the children from father's custody. We affirm.

## FACTS AND PROCEDURE

The children came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on December 20, 2014. At approximately 6:50 p.m., officers from the Los Angeles Police Department responded to a call reporting a "[g]ang group with a gun" at the parents' apartment building. One of the officers was assigned to monitor the Langdon Street (LST) gang and was a court-qualified expert on the LST gang. He knew father as an LST gang member who lived at the location where the gang members were reportedly seen; he also knew father was on parole. The officers wanted to conduct a parole compliance search of father's apartment and knocked on his door. Mother looked through the blinds and retreated but did not answer the door. The officers knocked loudly on the locked door for three to four minutes until father opened it. They immediately noticed the odor of recently burnt marijuana permeating the apartment. C.M., 23 months old, was standing in the living room, and E.M., 11 months old, was in a playpen in the living room. After removing the children from the apartment, the officers found three known LST gang members in one of the bedrooms. They also found "an extremely realistic looking BB gun" in the closet of another bedroom. They "observed the bathtub faucet running full blast—a tactic that narcotics users/dealers use to flush narcotics down the drain." They contacted father's parole officer, who advised that father had violated his parole conditions, and they arrested father for a parole violation.

The officers took the children into protective custody "[d]ue [to] the conditions in the apartment." The social worker assessed the children at the police station. Both were active and running or crawling around the room and smiling. Neither had observable behavioral issues.

The social worker interviewed mother at the police station and father separately at the Van Nuys jail. Mother and father worked as the managers of the apartment

2

building.  Both said that, before police arrived, three people knocked on their door asking about a rental application.  They invited them into the apartment, after which the police came and knocked on the door.  Mother and father were scared when they saw the officers because father was on parole, so they took the three people to the bedroom.  It took them so long to answer the door because mother was not wearing a brassiere and wanted to put one on before letting the officers inside.  They were not smoking marijuana in the apartment before the officers arrived.  Father had a prescription for marijuana and kept it stored in the bathroom.  He usually smoked it while he was taking a shower.

Mother denied flushing any drugs down the drain.  Mother also denied using any illegal drugs and drug-tested negative.  She said she understood that she had created an unsafe environment for the children and was willing to comply with DCFS requirements for their return.  Father was also willing to cooperate with DCFS.

The court detained and released the children to mother (over DCFS's objection) on the condition that father not reside in the home, among other conditions.  It granted father monitored visits.

Mother's further statements for the jurisdiction/disposition report indicated father used marijuana for medical reasons (anxiety and attention deficit/hyperactivity disorder) and only did so at night when the children were asleep.  Father had to be available for work as the maintenance person at the apartment building and so could not use during the day.  He was never under the influence of drugs while supervising the children.  Mother provided the social worker with father's medical marijuana card, which had expired in October 2014.

Father reported that he renewed his medical marijuana card but had lost it.  He said he "had a little [m]arijuana when the police showed up" on December 20, 2014, and he "told them where it was."  He only used at night when the children were sleeping.  Father said he did not know the people he let into the apartment on December 20 were gang members, though mother admitted to the social worker that she knew they were gang members.

3

Mother acknowledged that she and father had previous DCFS involvement in September 2014. She called the police when father hit her and obtained a restraining order, but she and father reconciled. The September 2014 referral also alleged general neglect, emotional abuse, and exploitation of mother's niece, who lived with them at the time. Among other things, mother's niece had reportedly witnessed domestic violence incidents between mother and father, and the niece had removed C.M. and E.M. from the room when the last altercation occurred. DCFS investigated and determined intervention was not warranted. It closed the case as inconclusive.

A check of mother's criminal history revealed no convictions. Father's criminal history included a 2010 conviction for assault with a deadly weapon other than a firearm by means of force likely to produce great bodily injury (Pen. Code, § 245, former subd. (a)(1)); a 2012 conviction for resisting an officer (Pen. Code, § 148, subd. (a)(1)); a January 2014 conviction for resisting an officer and contempt of court (Pen. Code, §§ 148, subd. (a)(1), 166, former subd. (a)(10)); and a June 2014 conviction for domestic battery (Pen. Code, §§ 242, 243, subd. (e)(1)). Father was also arrested in 2012 for willful infliction of corporal injury upon a cohabitant. (Pen. Code, § 273.5, subd. (a).) The case was deferred for revocation of parole and he was not convicted of this offense.

The police report of the 2012 domestic violence incident indicated that father had punched mother multiple times in the face and pushed her, leaving visible injuries on her eye, arm, and shoulder.

The police report of the June 2014 domestic violence incident indicated that mother was in the shower when father started banging on the bathroom door because the children were crying. He wanted mother to come out and help him. When she did, father grabbed her towel from her hand and began yanking her hair. He released her hair and punched her in the eye, then slipped and fell into a mirror hanging on the bedroom door. The mirror broke and cut father's arm. Mother told the responding officers that she did not want a restraining order against father because she did not want him to lose custody of the children. When mother reported this incident to the

4

social worker during an interview in February 2015, her account differed significantly. She said father became upset when one of the children started crying while mother was showering. They "had an argument" and father pushed her on the bed. She said nothing about father hitting her or breaking the mirror and cutting his arm.

Father pled no contest to the June 2014 domestic battery charge. The court sentenced him to probation. The criminal court issued a protective order for him to stay 150 yards away from mother. It also ordered him to complete a 52-week domestic violence treatment program. Father indicated he took domestic violence classes for six months but did not finish the program "because of the money so [he] asked to do time for the rest of it."

As of April 2015, mother had submitted to five random drug tests with negative results. She had not enrolled in any programs since the inception of the case, though DCFS had provided her with a list of resources for parenting classes and counseling. Father had been incarcerated since his arrest and, at a hearing on February 23, 2015, father's counsel indicated he would be released "in the next few weeks." Father was apparently released by April 2, 2015, because he met with the social worker then. He consented to random drug testing and provided proof that while incarcerated, he had participated in domestic violence, drug education, anger management, and parenting classes (from February 18, 2015, through March 13, 2015). He also attended Alcoholics Anonymous or Narcotics Anonymous meetings twice a week. As of April 20, 2015, father had not visited the children. He had a new job as a truck driver and was "gone a lot." He had one missed drug test on April 2 and no other tests in the record. He had not enrolled in any programs since his release, though DCFS had provided him with referrals.

The jurisdiction and disposition hearing took place on April 20, 2015. The operative petition alleged the children had suffered, or there was a substantial risk they

would suffer, serious physical harm or illness as a result of the failure or inability of the parents to supervise or protect them adequately (Welf. & Inst. Code, § 300, subd. (b)(1)).[1]  The first count alleged mother and father created a detrimental and endangering home environment for the children by "allow[ing] known gang members to frequent the children's home and abuse illicit drugs," by "expos[ing] the children to marijuana use," and by violating parole in father's case.  The second count alleged that father's history of illicit drug use and current abuse of marijuana rendered him incapable of providing regular care and supervision of the children, and further, mother knew of his drug use and failed to protect the children from him.  These actions allegedly endangered the physical health and safety of the children.  The third and final count of the petition alleged mother and father had a history of violent altercations, including father's June 2014 conviction for domestic battery, mother failed to protect the children from father, and this conduct also endangered the children's physical health and safety.

The court sustained all three counts and found the children were persons described by section 300, subdivision (b).  The court noted:  "[W]hether or not the parents want to acknowledge that they were, essentially, harboring gang members, if they didn't know they were gang members, it wouldn't have mattered because the police, walking into this room, finding marijuana smoke in the home not only jeopardizes the parents' credibility, frankly, but the children's health, safety, and welfare.  [¶]  The mother minimizing the mother's use,[2] in fact, when she is, frankly, choosing what happened, and it does place the children at risk.  I am going to find

---

**1**      Further undesignated statutory references are to the Welfare and Institutions Code unless otherwise stated.

**2**      Although the court referred to "mother's use" here, it likely meant that mother was minimizing *father's* use, as there was no evidence that mother also used marijuana.

6

great difficulty finding out what is happening in this household. [¶] . . . [¶] I suspect I don't have to tell either of these parents the danger of any kind of smoke around children and young children in their lungs being developed." While the court's comments focused on the allegations of marijuana use, the court also found "[t]here is enough evidence to sustain all three of those counts by preponderance of the evidence. [¶] There is a factual basis contained in the reports that I have read today for these findings."

The court placed the children with mother under the supervision of DCFS and ordered monitored visitation for father. It indicated it would address whether father could return to the family home at a three-month review hearing as opposed to a six-month hearing. Both parents filed timely notices of appeal.

Since filing the notice of appeal, father has filed two requests for judicial notice in this court. The first seeks judicial notice of a minute order for the July 2015 three-month review hearing. The minute order shows the court continued the home-of-mother placement order but granted father one overnight visit per week in the family home. The second request seeks judicial notice of a minute order for the October 2015 six-month review hearing. According to this minute order, the court entered a home-of-parents order, released the children to the parents, and terminated jurisdiction. We grant both requests for judicial notice.

## STANDARD OF REVIEW

We review the court's jurisdictional findings and disposition for substantial evidence. (*In re J.S.* (2014) 228 Cal.App.4th 1483, 1492; *In re R.C.* (2012) 210 Cal.App.4th 930, 940.) "[T]he issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be

7

sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*Alexis E.*).)

## DISCUSSION

Preliminarily, we consider the justiciability of this appeal, since the dependency court has recently returned the children to the custody of both parents and terminated jurisdiction. "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.'" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) Even when the court's order terminating jurisdiction affords the relief sought by the parents (here, return of the children), we may exercise our discretion to reach the merits of an appeal "in an abundance of caution and because dismissal of the appeal operates as an affirmance of the underlying judgment or order." (*Id.* at p. 1489.) A court's jurisdictional findings, "if erroneous, could have severe and unfair consequences to [a parent] in future family law or dependency proceedings." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716.)

In *In re C.C.*, the juvenile court terminated jurisdiction during the pendency of the appeal and restored the mother's right to monitored visitation in its exit order, "the very relief she [sought] by her appeal." (*In re C.C., supra*, 172 Cal.App.4th at pp. 1488-1489.) Still, the court considered the merits of the appeal because of the possibility of prejudice in subsequent family law proceedings posed by the challenged order. (*Id.* at pp. 1489, 1492.) To dispel any notion here that the parents might be prejudiced by erroneous orders in future proceedings, we review the merits of the appeal and conclude affirmance is appropriate.

## 1. *Jurisdiction*

Mother contends substantial evidence did not support the court's jurisdictional findings, and father joins in mother's arguments. We hold substantial evidence supported jurisdiction.

In pertinent part, section 300, subdivision (b)(1) authorizes the juvenile court to assert jurisdiction over children when they "ha[ve] suffered, or there is a substantial risk that the child[ren] will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." The three components of jurisdiction under section 300, subdivision (b) are neglectful conduct by the parents, causation, and serious physical harm or illness, or a substantial risk of such harm, to the children. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.)

Here, substantial evidence supported the jurisdictional finding based on father's exposing the children to marijuana use and domestic violence between the parents. While it is true that a parent's use of marijuana *alone* will not support a finding of risk to children (*Alexis E., supra*, 171 Cal.App.4th at p. 452), this record establishes more than that. When the officers entered the family's home on December 20, 2014, they immediately noticed the odor of recently burnt marijuana permeating the apartment and the bathtub faucet was running full blast, after it had taken the parents several minutes to open the door. The court could reasonably infer from these facts that father was smoking marijuana. Mother and father insisted father only smoked marijuana when the children were asleep, but the officers found the children awake and in the living room. While the evidence of father's use around the children may be characterized as conflicting, the court obviously credited the evidence that father was smoking marijuana around the children and found the parents lacking in credibility. ("[T]he police, walking into this room, finding marijuana smoke in the home not only jeopardizes the parents' credibility, frankly, but the children's health, safety, and welfare.") This credibility determination and the resolution of conflicting evidence are within the lower court's domain, and we will not disturb these determinations.

Father's use of marijuana around the very young children was sufficient to support a finding that his conduct constituted a risk of harm to the children. *Alexis E.* provides an apt analogy. In that case, the evidence indicated the father used marijuana in the children's home and in their presence, and they could smell it. (*Alexis E., supra*,

9

171 Cal.App.4th at pp. 441-442, 451-452.) The court held: "The trial court could reasonably find that Father's use of marijuana constituted a risk of harm to the minors because of Father's failure to protect the minors from the marijuana smoke. . . . [T]he risk to the minors here is not speculative. There is a risk to the children of the negative effects of secondhand marijuana smoke." (*Id.* at p. 452, citations omitted.) The court went on to note that nothing in the state's voluntary medical marijuana program authorized a person lawfully using medical marijuana to do so "'within 1,000 feet of the grounds of a school, recreation center, or youth center, unless the medical use occurs within a residence,'" and concluded that "[a] reasonable inference to be drawn from this prohibition is that use of marijuana near others can have a negative effect on them." (*Ibid.*, quoting Health & Saf. Code, § 11362.79.)

Mother concedes that "[a]rguably, one-time exposure to marijuana is harmful to a child," but, she asserts, one-time exposure to the smell of marijuana is insufficient to establish a substantial risk of harm. This argument misses the mark. The smell of recently burnt marijuana suggested that it had recently been smoked in the apartment, and as *Alexis E.* teaches, it is secondhand marijuana smoke that is harmful to children, not the smell alone.

Even apart from the marijuana use, substantial evidence supported the finding that domestic violence between the parents put the children at risk of harm. "Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)." (*In re R.C., supra*, 210 Cal.App.4th at p. 941.) "[D]omestic violence in the same household where children are living is neglect; it is a failure to protect [children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.) Children can be "put in a position of physical danger from [domestic] violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." (*Ibid.*)

The risk is clear from what we know about the June 2014 altercation for which father was convicted. The altercation started because father was upset the children were crying and he wanted mother to calm the children. Thus, the children were present when the altercation occurred, if not in the same room. Father's assault on mother caused him to slip, inadvertently break a mirror, and cut himself. This kind of collateral damage—glass breaking in the course of an altercation—obviously poses a risk of injury to children, especially ones as young as C.M. and E.M., who cannot remove themselves from the scene of violence. There was some suggestion from DCFS's inconclusive investigation in September 2014 that mother's niece had witnessed domestic violence between mother and father more than once and had removed the children from the room when the last altercation happened. It is unclear whether this was the June incident, but in any event, it was the parents' job to protect the children, not the minor niece's job.

Further, we know there was at least one other recorded instance of domestic violence between the parents when father was arrested in 2012. Domestic violence therefore appears to be an ongoing problem, that the parents had yet to address themselves. The criminal court ordered father to complete a domestic violence program as part of his June 2014 sentence; he did not and served time instead. It also issued a protective order for him to stay away from mother, but he and mother reconciled and began living together again. In short, the court had ample evidence of domestic violence posing a substantial risk of harm to the children and properly based its jurisdiction on this evidence.

Mother's remaining arguments challenging jurisdiction are fruitless. She maintains there was no evidence that gang members "frequent[ed]" the home as alleged in the petition, and moreover, no evidence that their presence in the home on December 20, 2014, posed a substantial risk of harm to the children. Likewise, she argues, there was no evidence that father's arrest for a parole violation posed a substantial risk of harm to the children, and no evidence that father "abused" marijuana, as opposed to merely used it. We are inclined to agree that there is little or

11

no evidence supporting these allegations. But a petition often alleges multiple grounds for the assertion that a minor comes within the dependency court's jurisdiction, as in this case. We may affirm the juvenile court's finding of jurisdiction over the minor if any one of the bases for jurisdiction enumerated in the petition is supported by substantial evidence. (*Alexis E., supra*, 171 Cal.App.4th at p. 451.) And here, as we have discussed, substantial evidence supported at least two of the grounds alleged in the petition.

### 2. *Disposition*

Father asserts clear and convincing evidence did not support the dispositional order removing the children from his custody. We apply the substantial evidence standard on appeal (*In re J.S., supra*, 228 Cal.App.4th at pp. 1492-1493), however, and find sufficient evidence supported the order.

Section 361, subdivision (c), provides in pertinent part: "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

"A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground by *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

12

*In re J.S., supra*, 228 Cal.App.4th 1483 held that domestic violence between parents afforded cause to remove children from both parents. (*Id.* at p. 1493.) The parents had engaged in mutual domestic violence for several years, most recently right before the children were detained, and the children were present during altercations. The last altercation occurred even though the parents no longer lived together. (*Id.* at pp. 1487-1488, 1493.) The court concluded the juvenile court could reasonably find removal necessary because the parents still had a relationship and "'various needs for each other.'" (*Id.* at p. 1493.) Though the father relied "on *In re Basilio T.* (1992) 4 Cal.App.4th 155, which held that two incidents of domestic violence between the parents afforded insufficient evidence to support removal, because 'neither incident directly affected either minor physically . . . ,'" the law had changed significantly since *In re Basilio T.* (*In re J.S., supra*, at p. 1493, quoting *In re Basilio T., supra*, at p. 171.) At the time of *In re Basilio T.*, section 361 allowed removal only for substantial danger to the physical health of the minor. (*In re J.S., supra*, at p. 1493.) Since then, the Legislature has amended section 361 to allow removal for "'substantial danger to the physical health, *safety, protection, or physical or emotional well-being* of the minor . . . .'" (*In re J.S.*, at pp. 1493-1494.) Ongoing domestic violence in the presence of the children constituted "substantial evidence of a substantial danger to the children's emotional well-being, if not their physical well-being." (*Id.* at p. 1494.)

The same reasoning applies here. Domestic violence had occurred because something the children did set father off. The parents were not properly addressing such violence when left to their own devices. These circumstances posed a substantial danger to the physical well-being of the children. The children need not have been actually harmed before removal from father was appropriate. Father contends workable alternatives to removal existed in that the parents were going to receive services, and "in-home counselors were available to assist the family and avoid any safety issues." Father cites to *In re Henry V.* (2004) 119 Cal.App.4th 522, 528, in which the court removed a child from his mother after she physically abused him and placed him outside the home in foster care. The appellate court expressed concern that

the juvenile court "did not appear to fully appreciate 'the balance between family preservation and child well-being struck by the Legislature' when it drafted section 361." (*Id.* at p. 530.)  This case can be meaningfully distinguished from *In re Henry V.* The court attempted to strike that balance between family preservation and child well-being by keeping the children with mother in the family home and only removing them from father, even though it sustained allegations against mother for failure to protect. We cannot say the court's attempt to strike a balance was error.

## DISPOSITION

The orders are affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

14